182 P.2d 83

**SOUTHWEST LUMBER MILLS, Inc., v. EMPLOYMENT SECURITY COMMISSION et al.**

No. 4821.

Supreme Court of Arizona.

June 17, 1947.

Fennemore, Craig, Allen & Bledsoe, of Phoenix, and McQuatters & Stevenson of Flagstaff, for appellant.

Arthur M. Davis, of Phoenix, for appellees.

KELLY, Superior Judge.

In a proceeding .originally before the Employment Security Commission, findings were made followed by conclusions and order holding the appellant liable for unpaid tax upon wages accrued, as more fully set forth hereafter, in logging operations in a Government forest for the supply of its lumber mill. Upon appeal to the superior court like findings and conclusions

were adopted followed by judgment adverse to appellant. The matter is here for review.

The facts set forth in the view most favorable to appellees and as fully as they need be in support of the judgment are as follows.

Appellant is a large manufacturer of lumber, with mill in Flagstaff. Its sawlogs come largely from a federally owned National Forest. Pursuant to an offer of sale of dead timber standing and live timber marked by officers in charge of the forest, appellant became the purchaser of the trees and logs in a large area of forest lands, with license to enter upon them for the removal of their purchase, the ultimate object of which was to transport such logs to its mills for conversion into lumber.

In this purchase and sale contract there were many specifications upon the identification of the logs and trees sold, the method of disposal of the tops and brush, the protection of immature growth, etc., all having for their purpose the prudent and scientific management of the forest and its conservation, none of these conditions having more than an incidental bearing upon the question now to be determined. These specifications were a part of the contract and the observance of them a part of the stipulated performance of it by the purchaser. To carry on its business of sawing and selling lumber it was of course necessary for appellant to fell the trees, to cut the logs into manageable lengths, and to transport them to its millpond for sawing in its mill. In former times appellant itself performed this work, owning and operating the equipment necessary to accomplish it, but many years before had disposed of this equipment and had subsequently relied upon contractors who because of their skills and efficiency, and the high degree of their executive capacities, could manage it more efficiently and economically. It called for bids to do this work. Bruce Gibson was the successful bidder, and the entire job was contracted to him. He entered upon its performance with the unanimous belief of himself, his employers, the appellant, the appellees and all others affected by the operation that he was the entrepreneur to whom this particular item of work was entrusted; that he was performing it upon his own account; and that he was the employer of all service rendered in the conduct of this item of business in which he was engaged. He picked his own crew and determined in agreement with them their rates of pay, their hours of work, and all other terms of their employment, with none of which appellant either concerned itself or under its contract reserved the least power to control. He was an established logging contractor, a specialist in that branch of the lumbering industry; had operated in that line exclusively for many years; owned and used in carrying on his business many items of valuable mechanical equipment, ranging as need arose to a value of more than one hundred thousand dollars; had and took

contracts of a similar kind with other sawyers; and during a part of the time of the performance of this contract was contemporaneously engaged upon a similar one of like magnitude with another large manufacturer of lumber; and was carried on the books of the appellee Commission as an employer on his own account. He carried on his operation on this basis, paying to the Commission the tax upon his own payroll, and so continued until his bankruptcy, with his contract with appellant not completed. For some time prior to his failure he had defaulted in the payment of the tax upon the wages accruing to his servants, and his estate not being adequate to pay it, these proceedings have resulted upon the claim that as the primary employer the appellant is itself liable for the tax.

The question presented is whether the appellant, for whose ultimate benefit in the conduct of its business of manufacturing lumber all of the services were rendered, was the employer of Bruce Gibson and liable for the payroll tax for all services rendered by him in the performance of his contract to cut, buck, brush and transport these logs from the Government forest to appellant's millpond. It may be mentioned that under his contract it became a part of his obligation to abide by the specifications and regulations of the Forest Service imposed upon the purchaser by the terms of the timber sale agreement between it and the Government.

The underlying statute levies a tax upon the employer's payroll. Section 56-1002 (i) (5), June 1945 Cum. Pocket Sup. to A. C.A.1939.

"Definitions.—

\*  \*  \*  \*  \*

"(5) Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this act unless, and until it is shown to the satisfaction of the commission that:

"(A) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of hire and in fact; and

"(B) Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C) Such individual is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of service."

The primary question presented thus becomes one as to whether the services rendered by Gibson come within the terminology of Clause (5) as "services performed by an individual for wages or under any contract of hire." If the answer is in the affirmative there remains the ques-

'tion as to whether they come within the exception of subclauses "A", "B", and "C" considered conjunctively, those under "B" being stated in the alternative.

A great part of the briefs and argument is devoted, as necessarily it must have been, to a consideration of the applicability of these exceptions against the contingency that the answer to the primary question should be in the affirmative. As the answer is in the negative these issues are not exhaustively discussed, nor the question of the persuasiveness of the past action of the Commission in considering Gibson as the employer and accepting from him tax payments as such. It is conceded, and it is clear from a long line of authorities of which the latest from Arizona is Crane Co. v. Arizona Tax Comm., Ariz., 163 P.2d 656, 662, 163 A.L.R. 261, that no erroneous regulation or action of the taxing officer can serve to "exempt a taxpayer from the payment of a tax unless such authority has been specifically granted to it by the legislature." It is not thought, in the absence of details of the sources of information availed of by the Commission as to the identity of the employer from whom a tax was due, or of the thoroughness or conclusiveness of their investigation or determination, that their acceptance of a proffered tax is persuasive upon the question of the liability of one or another employing unit therefor; but it seems clear that entirely independent considerations fully support a negative answer to the primary question above stated.

In coming to any answer it has been remembered that the statute is remedial; that it enunciates and is addressed to a public policy; that it is ameliatory of the evils resulting from lack of employment; that it is to be liberally construed to effectuate its purpose; that devices of every kind to defeat it are to be frowned upon and stricken down; and that by the several Arizona cases construing and giving it effect this court has adopted an interpretation of it strictly in accord with its intent and objects as announced by the legislature in the preamble to the Act. Sisk v. Arizona Ice & Cold Storage Co., 60 Ariz. 496, 141 P.2d 395; Gaskin v. Wayland, 61 Ariz. 291, 148 P.2d 590; First Nat. Benefit Society v. Sisk, Employment Security Comm. of Arizona, 65 Ariz. 1, 173 P.2d 101, cf., also Singer Sewing Machine Co. v. Industrial Comm. of Utah, 104 Utah 175, 134 P.2d 479, and cases cited.

It may further be said that as the field opened by this legislation is new, the statutory definition of terms and an interpretation consistent with the objects and purposes for which the Act was adopted should be applied rather than those definitions and interpretations applicable by long usage and association to the common-law relationships of master and servant, employer and employee, and principal and agent.

The present question is not, as suggested by appellee, whether the holding and philosophy of Sisk v. Arizona Ice & Cold Storage Co., supra, are to be overthrown; this suggestion assumes the premise which is itself the question. To the contrary we would wish to fortify and reaffirm not only that case, but others of this jurisdiction which follow it, for they are logically sound and historically correct.

In the case of Southwest Lumber Mills, Inc., v. Industrial Comm., 60 Ariz. 199, 134 P.2d 162, involving the present appellant and in its facts closely correlated to this, our court has held that upon the very contract now involved, and in his performance of it, Gibson was in fact an independent contractor; but by reason of the different statutes and a distinct rule of construction applying in each case that decision is not determinative of the present controversy. The case does have a value, however, to dispel any incipient suspicion that the contract was sham or a subterfuge, and assists in a just evaluation of its implications.

■ To arrive at a true answer to our present question it is necessary to come to a correct determination of the relationship between appellant and Gibson under their contract, or more accurately, under their acts and conduct both toward it and toward each other in the performance of it. It is not the terms of the written contract which give it its character in determining the relationship of the parties to each other and in the application of the statute to it.

As said in Unemployment Compensation Comm. of Virginia v. Collins, 182 Va. 426, 29 S.E.2d 388, 391, strongly relied upon by appellee: "It is true that the contract so provides on its face. But we are not here dealing with a suit on the contract, nor are we primarily concerned with its interpretation. Our inquiry is whether Hester, in cutting the timber owned by Collins and manufacturing it into finished lumber, was performing services for Collins and was in his employment under the Act. In attempting to solve that question we are not so much concerned with what the contract says as we are with the actual practice of the parties which supplemented their written agreement. (With citations.)"

It may be here said that neither upon the face of this contract, nor by the practice of the parties which supplemented it, nor by any suggestion throughout the course of these proceedings does any hint arise that an ulterior design existed, by means either devious or disingenuous, to circumvent the operation of the payroll tax, or that either the contract or the modus operandi under it were other than what they purported to be—an engagement between the parties for a definite fixed object, over a fixed term, for a definite price; or, in other words, a fixed price to be paid for a denominated measurable result.

■ This is not to say that the primary employer may adopt a contract method of farming out his work and thus exempt himself from liability for the tax. The

facts of each case must be scanned and appraised and care taken that the Act is not thus defeated. That the error of assuming that the mere interposition of an independent contractor between the primary employer and the services rendered severs the employer-employee relationship is one easily fallen into may be illustrated by an obiter statement in the case of Gaskin v. Wayland, supra [61 Ariz. 291, 148 P.2d 591], where the court says: "In this case the merchants desiring property protection hired appellants as an independent contractor. Appellants hired their patrolmen for wages, ergo; the patrolmen are the employees of the appellants and not (of) the merchants."

The statement is literally true, and under the facts of that case was a wholly appropriate one to make; but it should not be understood as implying that in circumstances parallel with those now under consideration the primary employers would not be liable for the payroll tax. It seems clear, however, that personal services, for wages, in the walking of a police beat are in no way comparable with the performance of the logging contract with which we are here concerned, in which the logger had and used in performing his agreement a very substantial capital investment and used it indiscriminately according to his own judgment in performing not only this agreement but another of similar magnitude with another distinct corporation, and in which it is impossible to separate out of the price the items going into wages and into what would be the rental or use value of his mechanical equipment.

■ It has been heretofore conclusively determined, Southwest Lumber Mills v. Industrial Commission, supra, that the relationship sustained by Gibson to appellant in this precise operation was that of an independent contractor, thus bringing appellant's immunity within the coverage of exception "A" of the statute quoted supra. The facts indicate that exceptions "B", first alternative clause, and "C" are similarly applicable, the field of this operation being a specialized one to which the intimate knowledge and unique skill of the contractor were peculiarly adapted, and in a branch of the overall industry abandoned long before the adoption of the statute to entrepreneurs of whom Gibson was but one. These points are not, however, more fully elaborated for a reliance upon them is not necessary to the conclusion as herein stated.

■ The Utah case of Singer Sewing Machine Company v. Industrial Commission, supra [104 Utah 175, 134 P.2d 486], contains many enlightening observations. Among them, and of higher than ordinary value because they were expressly made to eliminate for once and all every misconception of the proper meaning to be attributed to prior opinions upon the same subject are these:

"The question as to whether one performing personal services is performing

them for another or for himself usually offers no difficulty. In a few borderline cases, where services for another and for self may overlap, or where an artificial relationship may be set up between the parties, some difficulty may be encountered. It may be stated that [beyond any question] services are performed for another when performed under his supervision, direction and control, in the performance of the details of the work and in the use of the means employed; (Texas Co. v. Wheeless, 185 Miss. 799, 187 So. 880) [or] when he has the right to hire (select the worker) and the right to fire (terminate the employment) and when the compensation, if any, accruing to the worker becomes a direct liability on the other party. But all these are not always present, [Is not this an equivalent of a statement that he may be in 'employment' without 'control' or without 'the right to hire and fire' or without compensation 'being a direct liability' on the other party] and if present they may not be evident on a casual examination. * * *"

" * * * Since there was no obligation on plaintiff to pay claimant any remuneration for services, but claimant must get his remuneration, if any, from his ability to sell the brushes at an advanced price over the cost to him and that he and not plaintiff assumed the risk of profit or loss on the venture or undertaking, it follows claimant's services were not rendered for wages or under a contract of hire." (Material in brackets represents inclusions by way of explanation inserted into the quoted matter by the author of the opinion.)

In the contract in question there was no assumption of liability whatever by appellant for any part of the contractor's performance, the kind and order of which rested exclusively with him, except as calculated by way of price upon the fulfillment of the contract's terms. No duty rested upon the contractee except to pay the price upon the delivery of the logs, and no right accrued to it except the one of demanding delivery as the condition for its payment. Not one step thereof was performed, or to be performed, under the supervision, direction, or control of appellant. The details of the work and the means employed to accomplish it were under the sole control of the contractor. The appellant had no right either to hire or to fire the servants of the contractor, nor fire the contractor himself. The compensation of none of the helpers engaged in the work became an obligation upon appellant; and even the services of the contractor himself, regardless of their extent, created no liability upon the appellant except by the delivery of the logs, and then only to the extent of the delivery measured in M board feet.

By way of illustration it may be noted that Gibson's performance of his contract in practice necessitated a substantial expenditure by him in the building of roads by which to haul out the logs. Without doubt this consideration entered into the

basis of the price agreed upon for the delivery of them. Not one dollar of this expense, nor for the servicing and supply or use of his mechanical equipment was compensable to him, nor became an obligation of appellant, for the single measure of pay to which he was entitled from appellant was the board feet content of the logs delivered· at its millpond. At any point in the performance of his contract had the contractor quit no right accrued to him for part payment for what he had thus accomplished except such as might rest in good morals, but none in law. Clearly, in performing his contract the services he rendered were to himself, for his own account, in the expectation of. earning a net profit from the completed operation.

The execution of the contract at once gave rise to vested rights. By its terms, confirmed by the practice of both parties under it, the time for it to remain in force continued to its full completion. The order in which each step was to be taken rested alone in the discretion of the contractor. Certainly the appellant would have been suable for damages for bringing the agreement to an end in the midst of performance, as the contractor would have been liable for nonperformance. It is immaterial that Gibson, by his contract with appellant, agreed to abide by the Forest Service regulations with regard to the condition in which the forest was to be left after the removal of the logs marked for sale, and which were a part of the purchase and sale agreement between the Government and appellant, for in turn adherence to them became a part of the contract between him and appellant upon which in part the price depended.

It is to be noted in passing upon the good faith of the parties to the contract, substantially distinguishing this case from that of Collins, supra, in its facts, that the contractor, Gibson, had for many years made this precise form of operation his specialty; that he used in it his own very valuable equipment; that the work involved skill and judgment of high order; that contemporaneously he carried on a like operation for another principal; that he had his own crew or crews of helpers of his own choice, none of whom nor whose rates of pay were known to appellant.

The only suggestion of control exerted by appellant over the performance of the work, and its significance is heightened by the fact that it is wholly inconsequential, is that a log scaler employed by it came occasionally to the forest to view the progress of the work and talked not with Gibson, but sometimes with his men, and sometimes with Forest Service officials.

Before leaving this subject it may be well to add that nothing said herein is meant to detract from the rule announced in the Virginia case of Unemployment Comp. Comm. of Virginia v. Collins, supra. Applied to those or like facts the rule meets with approval and commendation; but in that case every badge and all the facts

stamped the relationship between the contracting parties as one of employer and employee in clumsy disguise with intent to defeat the statute. A distinction may possibly arise from the fact that the Virginia statute used the word "remuneration" whereas our own makes use of the terms "for wages" under any contract of "hire".

While the terms "wages" and "hire" as used in the Act are withdrawn (Sisk v. Arizona Ice & Cold Storage Co., supra) from their historic common-law context and their ancient restricted meaning, and come into this statute subject to an interpretation conformable with its liberal and remedial purposes, it does not seem proper that they should be so wrested or distorted out of all meaning that they have none, except such as would enlarge the coverage even of a law having beneficence its prime objective. The Act was intended not for the protection of men of business having the profit motive as their guiding star, but of laborers in the vineyard whose prime assets are strong and willing hands, art, and ability, and whose great interest, in unity with that of the state, is security from unemployment and the loss of their earnings, however these be measured, from their labor, knowledge, and skill. It seems greatly to strain the words "wages" and "hire" to employ them, even with the rule of liberality proper to a case under this statute, to an operation requiring the use of a capital investment of great magnitude, in a specialized industrial undertaking, in which "wages" in any possible sense cannot be screened out of a price in which "returns from capital" are inseparably intermingled and in which the operator's real earnings or net gains, himself assuming the risk of loss, depend upon his managerial skill and ability and in the exercise of his own unfettered judgment as to the means he uses by which he expects to realize a profit. In the largest sense it is the ultimate consumer who is the real employer and who actually pays for all services entering into the product his money buys. Somewhere between the services and the last beneficiary of them there must come a point at which there is a break in the connection between them where the payroll tax liability ends.

A statement in 48 Am.Jur., Soc.Sec., Unemploy.Ins., sec. 14, p. 522, on this subject seems fundamentally sound: "* * * Contributions under the acts and benefits paid thereunder are paid with respect to wages payable for employment. In other words, the acts cover only individuals who have been, or are, in 'employment,' and who receive 'wages' as those two terms are defined in the acts. The essential elements of 'wages' as defined in a state act have been stated to be that they form a direct obligation against the employer, in favor of the employee; that when the service is performed, the compensation, if any, accrues and becomes payable regardless of the success or failure of the undertaking; that any profits or earnings over and above costs of the service accrues to the employer, and

any loss as a result of the undertaking or service must also be borne by him. * * *"

The recent cases of California Employment Stabilization Comm. v. Wirta, Cal. App., 171 P.2d 728; California Employment Stabilization Comm. v. Gusmeroli, Cal.App., 171 P.2d 913; and Irvine Co. v. California Employment Comm., 27 Cal.2d 570, 165 P. 2d 908, at page 916, fully bear out the philosophy above quoted from the text, and they are a better criterion by which to determine the relationship with which we are now concerned than are the cases heretofore cited which upon their facts are so readily distinguishable from it. Of our Arizona cases that of Employment Security Comm. v. Arizona Citrus Growers, 61 Ariz. 96, 144 P.2d 682, furnishes a fairly comparable corollary to this conclusion.

The judgment is reversed.

STANFORD, C. J., and UDALL, J., concur.

Justice Arthur T. LaPRADE having disqualified himself as he was the trial judge, Hon. Henry C. KELLY, Judge, Superior Court, Yuma County, was called to sit in his stead.