236 P.2d 44

McCLAIN v. CHURCH et al.

No. 5429.

Supreme Court of Arizona.

Oct. 1, 1951.

Robert & Price, of Phoenix, for appellant.

D. Kelly Turner, of Phoenix, for appellee.

UDALL, Chief Justice.

The question presented by this appeal is whether under the provisions of the Employment Security Act of Arizona, Ch. 124, 1941 Session Laws is the governing statute, real estate salesmen are employees of the real estate broker under whom they are licensed to operate.

This action was brought by the Employment Security Commission of Arizona, plaintiff-appellee, under the provisions of sec. 56–1014 (a) (1) and (2), A.C.A.1939, as amended, to recover from Jesse F. McClain, defendant-appellant, contributions, interest and penalties alleged to be due from defendant to plaintiff. From a money judgment for plaintiff, defendant appeals. For convenience the appellee will hereafter be referred to either as plaintiff or the commission and the appellant as defendant or broker.

By stipulation of counsel at the pre-trial conference it was agreed that if any taxes and interest were found to be lawfully due the commission from defendant for the period (January 1, 1945 to February 19, 1947) that the correct amount of the principal tax was $1,193.45, with statutory interest thereon. Hence no question is now raised as to the specific amount for which judgment was entered.

The commission, acting through a referee, held a formal hearing on April 19, 1946, for the purpose of making findings of fact upon which a determination could be made as to whether the services performed by a salesman constituted employment by the broker within the meaning of the Act. On June 28, 1947, the commission by a unanimous decision held that such salesmen were "in employment" by the broker and therefore subject to the Act. It is agreed that the following findings of fact made at that time by the commission as a predicate for its decision substantially and correctly portray the modus operandi of the parties:

"The salesmen are hired by the brokers under a verbal contract with no time limit specified either written or orally. The contract may be terminated at will by either party. The brokers provide office space, telephone service and stenographic services for the salesmen. They also provide stationery and standard forms for taking a deposit on sales. Listings of property for sale may be obtained either by the broker or a salesman. Regardless of where the salesmen obtain their leads for a sale, they must pay the broker his commission. The usual commission is 50% to the broker and 50% to the salesman. A broker may enter into an additional agreement whereby a salesman may receive an additional 10% commission on a listing he has himself secured but which has been sold by another salesman. The 10% additional commission is paid half by the selling salesman and half by the broker. There are other minor deviations from the usual 50–50 division of profit from a sale. Services rendered by the broker such as provision of office space, telephone, advertising, etc., are paid from the broker's portion of the profits.

"All salesmen have access to and the right to sell any listing of the broker. No particular working hours are required of the salesmen. Sales meetings are occasionally called but are not at specified intervals. The salesmen are not required to close their deals in the broker's office but frequently do. Commissions usually come in the form of a check from the title company payable to the broker. The salesman's commission may be paid to him immediately upon receipt of the title company check or placed in the broker's office account and the division of commission made later from that account. If the broker makes a sale without any aid from a salesman, the entire commission goes to the broker.

"A number of salesmen engage in other business activities such as accounting, managing auto courts, raising cattle, building, life insurance sales, engineering and one salesman is also a railroad steward."

No appeal was taken by the defendant, who with other brokers were parties to the foregoing proceedings, or by any other broker affected by the commission's decision, under the provisions of sec. 56–1011 (b)(2), A.C.A.1939, Laws 1941, ch. 124, sec. 11, page 359. However, we deem it unnecessary to determine the legal effect of the failure to appeal inasmuch as the trial court in nowise based its decision upon that point, and it would be unfair to those defendants in the other suits governed by this appeal who were not parties to that proceeding.

The instant suit for the contribution tax claimed due from defendant was filed on June 19, 1947, and at the same time similar suits were brought against some twenty other respondent brokers. By stipulation it has been agreed that the findings, conclusions, and judgment of the court in the instant case shall be determinative of the

liability (except as to amount due) of the defendants in the other twenty cases, who are represented by the counsel now appearing for the defendant in the instant case.

In entering judgment for the commission the trial court expressly found that during the period (January 1, 1945 to February 19, 1947) the "salesmen were employees of the broker" and that the oral contracts of service "constituted a contract of hire and the compensation paid them in the form of commission constituted wages under the law." The defendant makes but one assignment of error, which is to the effect that the trial court erred in its ruling that real estate salesmen came within the terminology of the Act, the legal proposition advanced in support of this assignment being: "A real estate salesman is a person who works for a commission contingent upon success. He is an independent contractor and is not performing services for wages or under a contract of hire within the meaning of the Act."

It should be noted that the Eighteenth Legislature amended the Employment Security Act by expressly stating the term "employment" shall not include: "(J) Service performed by an individual for a person as a real estate broker or a real estate salesman, if all such service performed by said individual for such person is performed for remuneration solely by way of commission." Section 56–1002h, (e)(8)(J), A.C.A.1939, Ch. 24, 1947 Second Special Session Laws of Arizonia. This appeal,

however, must necessarily be determined by the law in force at the time the commission conducted the hearing and made its decision that brokers were liable for a contribution tax on wages (commissions) paid its salesmen. The pertinent statutory definition of employment read: " 'Employment' means any service * * * performed for wages or under any contract for hire, written or oral, express or implied." Section 56–1002(i)(1), A.C.A.1939, Ch. 124, Laws of 1941. It is not necessary to set forth the "so-called" A-B-C exemption provisions under (i)(5) of the last cited section for the reason that both parties, in their briefs, agree that these exemption provisions have no application in that such salesmen were not excluded by the A-B-C tests.

The courts have divided upon the question as to those who were covered by similarly worded unemployment compensation acts. One school of judicial thought adopted the view that the Act applied only to those who sustained toward each other the common law relationship of either master and servant or principal and agent, while the other adopted the view that it was intended by the lawmakers to, and the statutes defining "employment" did, enlarge the scope of that term and that it included many individuals who have otherwise been excluded from the benefits of the acts by the former concepts of master and servant and principal and agent as recognized by the common law. This court in the case of Sisk v. Arizona Ice & Cold

Storage Co., 60 Ariz. 496, 141 P.2d 395, definitely rejected the common law concept of "employment" and aligned Arizona with the jurisdictions enlarging the scope of the term. See also First Nat. Ben. Soc. v. Sisk, 65 Ariz. 1, 173 P.2d 101.

Whether real estate salesmen are employees of the real estate broker under whom they are licensed to operate is a question of first impression in this jurisdiction. There are but few reported cases precisely in point. The defendant, in support of his position primarily relies upon (a), three decisions from the supreme court of Washington that were handed down on April 13, 1945, viz.: Broderick, Inc., v. Riley, 22 Wash.2d 760, 157 P.2d 954; Curtis v. Riley, 22 Wash.2d 951, 157 P.2d 975; Coppage v. Riley, 22 Wash.2d 802, 157 P.2d 977; (b) two federal cases, viz.: Henry Broderick, Inc., v. Squire, 9 Cir., 163 F.2d 980; Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan, 8 Cir., 179 F.2d 882; (c) and two quotations appearing in our decision in the case of Southwest Lumber Mills v. Employment Security Comm., 66 Ariz. 1, 182 P.2d 83.

An examination of the Washington decisions cited, as well as those that have subsequently been handed down by that court, in the main support the defendant's position. There are, however, dissents and specially concurring opinions that indicate a badly divided court that appears to be experiencing difficulty in completely breaking away from the common law concept of master and servant. We concur with a statement of the supreme court of Oregon in Singer Sewing Machine Co. v. State Unemployment Compensation Comm., 167 Or. 142, 103 P.2d 708, 116 P.2d 744, 750, 138 A.L.R. 1398: "The two Washington cases cited in the opinion disclose an unsettled state of the law there." As to the federal cases relied upon there is such a significant difference between the Arizona statute defining the employer-employee relationship and the Federal statute under which the Dimmitt case was decided as to deprive these cases of any value as an authority in the instant case. Furthermore even though these decision were upon an identical statute they would not be controlling upon us.

In the Southwest Lumber Mills, Inc. case, supra, we quoted with approval a text statement defining "wages" appearing in 48 Am.Jur., Social Security, Unemployment Insurance, etc., sec. 14, the pertinent part reading: " * * * The essential elements of 'wages' as defined in a state act have been stated to be that they form a direct obligation against the employer, in favor of the employee; then when the service is performed, the compensation, if any, accrues and becomes payable regardless of the success or failure of the undertaking; that any profits or earnings over and above costs of the service accrues to the employer, and any loss as a result of the undertaking or service must also be borne by him. * * *" [66 Ariz. 1, 182 P.2d 89.] This statement on the meaning

of "wages" is certainly not in harmony with the statutory definition contained in the Act which reads: "* * * 'Wages' means all remuneration for services from whatever source, including commissions and bonuses and the cash value of all remuneration in any medium other than cash. * * *" Section 56–1002(n), A.C.A.1939, Ch. 124, Session Laws 1941. It also conflicts with the definition of wages as outlined by Justice Ross in the excellent opinion in the case of Sisk v. Arizona Ice & Cold Storage Co., supra, wherein this court quoted with approval from the case of Creameries of America v. Industrial Commission, 98 Utah 571, 102 P.2d 300.

The type of services and the nature of employment, together with the source of remuneration for such employment, involved in the Southwest Lumber Mills case is clearly distinguishable from the type of service and source of remuneration involved in the instant case, and hence the decision in the former case did not depend upon the challenged quotation from Am. Jur. We therefore reaffirm the definition of "wages" contained in the Sisk case and disapprove as not being apropos, the statement quoted in the Southwest Lumber Mills case.

We are of the opinion that when the law, as previously interpreted by this court relative to what constitutes "employ-ment" and what is covered by the term "wages", is applied to the agreed facts in the instant case that the trial court was correct in holding that real estate salesmen were employees of the real estate broker under whom they were licensed to operate. Manifestly the salesmen, in selling to purchasers from which sales the defendant broker would obtain half of the commissions, were performing services for the defendant. The legal right to collect the commission on sales made by the salesmen was in the defendant and not in the salesmen. The salesmen were bound to look to the defendant for their proportionate part of the commissions. The defendant was under obligation to pay the commissions to the salesmen. These commissions were necessarily paid for services rendered. The salesmen therefore were, as provided in the Act, performing services for "wages" which term includes commissions, for the defendant. Such was the holding in the following cases, interpreting similar statutes, and involving real estate brokers and their salesmen: Babb & Nolan v. Huiet, 67 Ga.App. 861, 21 S.E.2d 663; and Rahoutis v. Unemployment Compensation Commission, 171 Or. 93, 136 P.2d 426.

Judgment affirmed.

STANFORD, PHELPS, DE CONCINI and LA PRADE, JJ., concur.